IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs March 17, 2009

## STATE OF TENNESSEE v. CHARLES DAVID SMITHSON

**Appeal from the Circuit Court for Lawrence County**
**No. 26211     Stella Hargrove, Judge**

---

**No.  M2008-01398-CCA-R3-CD - Filed July 31, 2009**

---

Appellant, Charles David Smithson, was convicted by a Lawrence County jury of two counts of attempted first degree murder and one count of aggravated assault.  Appellant was sentenced to an effective sentence of forty-five years as a result of his convictions.  Appellant appeals his convictions for attempted first degree murder, arguing that the evidence did not show premeditation.  Following a review of the record, we determine that the evidence introduced at trial was sufficient to establish that Appellant committed attempted first degree murder.  As a result, the judgments of the trial court are affirmed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court are Affirmed.**

JERRY L. SMITH, J., delivered the opinion of the court, in which THOMAS T. WOODALL and ROBERT W. WEDEMEYER, JJ., joined.

John S. Colley, III, Columbia, Tennessee, for the appellant, Charles David Smithson.

Robert E. Cooper, Jr., Attorney General and Reporter; Brian C. Johnson, Assistant Attorney General; and Mike Bottoms, District Attorney General, for the appellee, State of Tennessee.

**OPINION**

On the evening of June 9, 2006, police were dispatched to the apartment of Betina Wayne, the girlfriend of Appellant.  At the apartment, police discovered Appellant, who claimed that he "killed one; possible two [people], and anybody that attempt[ed] to come in could get the same."  Virgil Wells, one of the victims, was lying in a recliner with a large laceration to his throat.  The other victim, Chad Benefield, had escaped the apartment and made it to the ambulance service station for help despite a large laceration to his throat.  Appellant was arrested and later indicted by the Lawrence County Grand Jury for two counts of attempted first degree murder and one count of aggravated assault.

Ms. Wayne and Appellant started dating sometime in March of 2006. She lived with Appellant briefly before moving in with her parents. When Ms. Wayne moved in with her parents, Appellant visited every day. He got jealous if anyone else came to visit Ms. Wayne. At some point, Appellant told Ms. Wayne's mother, Frankie Carolyn Stutts, that if Ms. Wayne moved into an apartment he would "camp out on her doorstep to see that nobody [went] in to see her." Appellant even told Ms. Wayne's father that if he could not have Ms. Wayne, "ain't nobody gonna get her." Appellant also tried to "buy" Ms. Wayne for $5,000. He actually wrote a check for this amount, but she tore the check up into pieces. Mrs. Stutts retrieved the pieces of the check and taped it back together after the incident.

Eventually, Ms. Wayne told Appellant that she did not love him but that she would be friends with him. Ms. Wayne moved into her own apartment. Appellant called her repeatedly. Ms. Wayne agreed to let Appellant come to her apartment. While he was there, he helped her put some of her stuff away. Appellant then went to the hardware store where he bought a knife.

While Appellant was gone, Ms. Wayne's friend, Chad Benefield, came over to the apartment.[1] Before Mr. Benefield arrived at the apartment, he had taken three muscle relaxers and had several beers. Virgil Wells, another friend, also came over to the apartment. Everyone in the group was drinking beer and watching movies. Ms. Wayne's adult daughter, Shana, was also in and out of the apartment that evening. At some point, Mr. Benefield smoked a marijuana cigarette. Mr. Benefield remembered overhearing a conversation between Appellant and Ms. Wayne at some point during the evening. Ms. Wayne asked Appellant to leave. They appeared to be having what Mr. Benefield characterized as "words." Appellant sat next to Mr. Benefield at some point. Ms. Wayne kept telling Appellant that Mr. Benefield and Mr. Wells were just friends.

Mr. Wells had been drinking off and on all day before going over to Ms. Wayne's apartment. Mr. Wells recalled having a conversation with Appellant about the Ku Klux Klan at some point prior to Appellant attacking him. During the conversation, Mr. Wells commented that he knew where the "Klan" had started in Pulaski, Tennessee and had even "been by the basement." During the conversation, Appellant informed Mr. Wells that he was a member of the "Klan." Mr. Wells could not recall the remainder of the conversation but remembered that he dozed off in the recliner afterward. Mr. Wells thought that he overheard an argument at some point during the evening between Appellant, Ms. Wayne, and Mr. Benefield.

Mr. Benefield recalled Appellant pulling his cell phone out of his pocket. He dialed a few numbers but did not hear anyone talking to him. Ms. Wayne asked Appellant with whom he was talking, and Appellant informed her that he was calling his daughter. Appellant was heard saying, "Honey, it's Daddy . . . . Meet me at the police station. I'm fixing to kill three people."

---

[1] Appellant had asked Ms. Wayne on a previous occasion if there was any type of romantic relationship going on between her and Mr. Benefield. Ms. Wayne denied any romantic involvement with Mr. Benefield.

At that point, Mr. Benefield attempted to leave the apartment. Appellant blocked the door, telling him "You ain't going no where. You gonna die." Appellant reached to his side, grabbed a weapon, and jabbed at Mr. Benefield. Mr. Benefield was cut twice on the hand and once in the throat. While Mr. Benefield fell to the floor, he heard Appellant say, "I told you, you effing bitch." Mr. Benefield managed to escape and drove in his truck to the nearby ambulance service. There was no one inside, but he managed to call 911. Mr. Benefield was stabilized at a local hospital before being airlifted to Vanderbilt University Medical Center in Nashville for emergency surgery.

After Mr. Benefield escaped from the apartment, Appellant approached Mr. Wells, who had been sleeping in the recliner. Mr. Wells woke up during the commotion. Appellant walked up behind Mr. Wells and slashed his throat. Mr. Wells immediately placed his hands on his throat. Appellant asked Mr. Wells, "How does it feel to die?" Appellant then kicked Mr. Wells in the ribs in an attempt to kick away his hands. Mr. Wells's throat was slashed all the way through the trachea.

At some point during the offense, Ms. Wayne's sister, Peggy Stutts, received a telephone call from Ms. Wayne, who was barricaded in the bedroom. Ms. Stutts was located in a neighboring county and was unable to call 911, so she called her mother to call 911.

Further attempts to reach Appellant on his cell phone were unsuccessful. Appellant answered the land line at Ms. Wayne's apartment and told Ms. Stutts that he "killed two" and was "going to kill some more." Ms. Wayne's mother decided to go to the apartment herself to assess the situation.

Mr. Stutts, Ms. Wayne's father, also called the land line and spoke with Appellant. Appellant refused to disclose the whereabouts of Ms. Wayne or her daughter. However, Appellant did tell Mr. Stutts that he had "killed two" and was "gonna kill some more."

When Officer Larry Glass of the St. Joseph Police Department arrived at the scene, he heard a male voice say that he had "killed one; possibly two, and anybody that attempts to come in could get the same." Officer Glass obtained entry into the apartment and saw Mr. Wells sitting in the recliner with a large laceration to his neck.

Appellant chose not to testify at trial. After the close of the proof, the jury found Appellant guilty of two counts of attempted first degree murder and one count of aggravated assault. Appellant was convicted of the attempted first degree murder of Mr. Benefield and Mr. Wells. The aggravated assault conviction stemmed from the acts Appellant committed against Ms. Wayne. At a sentencing hearing, the trial court sentenced Appellant to twenty years for each conviction for attempted first degree murder. The trial court ordered the sentences to be served consecutively. Additionally, the trial court ordered Appellant to serve five years in incarceration for the aggravated assault conviction and ordered that sentence to be served consecutively to the two other sentences, for a total effective sentence of forty-five years.

After the denial of a motion for new trial, Appellant initiated the appeal herein. On appeal, Appellant challenges the evidence as insufficient.

*Analysis*

Appellant argues on appeal that the evidence is insufficient to support his two convictions for attempted first degree murder. Specifically, Appellant contends that the evidence lacks proof of premeditation, an essential element of attempted first degree murder. Appellant asks this Court to remand the case for a new trial on attempted second degree murder. The State disagrees, instead taking the position that the record supports dual convictions for attempted first degree murder.

When a defendant challenges the sufficiency of the evidence, this Court is obliged to review that claim according to certain well-settled principles. A verdict of guilty, rendered by a jury and "approved by the trial judge, accredits the testimony of the" State's witnesses and resolves all conflicts in the testimony in favor of the State. *State v. Cazes*, 875 S.W.2d 253, 259 (Tenn. 1994); *State v. Harris*, 839 S.W.2d 54, 75 (Tenn. 1992). Thus, although the accused is originally cloaked with a presumption of innocence, the jury verdict of guilty removes this presumption "and replaces it with one of guilt." *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). Hence, on appeal, the burden of proof rests with the defendant to demonstrate the insufficiency of the convicting evidence. *Id.* The relevant question the reviewing court must answer is whether any rational trier of fact could have found the accused guilty of every element of the offense beyond a reasonable doubt. *See* Tenn. R. App. P. 13(e); *Harris*, 839 S .W.2d at 75. In making this decision, we are to accord the State "the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences that may be drawn therefrom." *See Tuggle*, 639 S.W.2d at 914. As such, this Court is precluded from reweighing or reevaluating the evidence when considering the convicting proof. *State v. Morgan*, 929 S.W.2d 380, 383 (Tenn. Crim. App. 1996); *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Moreover, we may not substitute our own "inferences for those drawn by the trier of fact from circumstantial evidence." *Matthews*, 805 S.W.2d at 779. Further, questions concerning the credibility of the witnesses and the weight and value to be given to evidence, as well as all factual issues raised by such evidence, are resolved by the trier of fact and not the appellate courts. *State v. Pruett*, 788 S.W.2d 559, 561 (Tenn. 1990).

When a defendant is charged with the attempted commission of a crime, there must be evidence that the defendant "[has acted] with the kind of culpability otherwise required for the offense" or "[has acted] with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part; . . ." T.C.A. § 39-12-101(a)(1), (2). Criminal attempt also occurs when the defendant "[a]cts with the intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense." T.C.A. § 39-12-101(a)(3).

First degree murder is defined as:

(1) A premeditated and intentional killing of another;

-4-

(2) A killing of another committed in the perpetration of or attempt to perpetrate any first degree murder, arson, rape, robbery, burglary, theft, kidnapping, aggravated child abuse, aggravated child neglect or aircraft piracy; or . . . .

T.C.A. § 39-13-202(a). Tennessee Code Annotated section 39-13-202(d) provides that:

"[P]remeditation" is an act done after the exercise of reflection and judgment. "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

An intentional act requires that the person have the desire to engage in the conduct or cause the result. *Id.* § 39-11-106(a)(18). Whether the evidence was sufficient depends entirely on whether the State was able to establish beyond a reasonable doubt the element of premeditation. *See State v. Sims*, 45 S.W.3d 1, 7 (Tenn. 2001); *State v. Hall*, 8 S.W.3d 593, 599 (Tenn. 1999). Whether premeditation is present is a question of fact for the jury, and it may be inferred from the circumstances surrounding the killing. *State v. Young*, 196 S.W.3d 85, 108 (Tenn. 2006); *see also State v. Suttles*, 30 S.W.3d 252, 261 (Tenn. 2000); *State v. Pike*, 978 S.W.2d 904, 914 (Tenn. 1998).

Premeditation may be proved by circumstantial evidence. *See, e.g., State v. Brown*, 836 S.W.2d 530, 541 (Tenn. 1992). Our high court has identified a number of circumstances from which the jury may infer premeditation: (1) "the use of a deadly weapon upon an unarmed victim;" (2) "the particular cruelty of the killing;" (3) the defendant's threats or declarations of intent to kill; (4) the defendant's procurement of a weapon; (5) any preparations to conceal the crime undertaken before the crime is committed; (6) destruction or secretion of evidence of the killing; and (7) a defendant's calmness immediately after the killing. *State v. Bland*, 958 S.W.2d 651, 660 (Tenn. 1997); *see also Pike*, 978 S.W.2d at 914-15. This list, however, is not exhaustive and serves only to demonstrate that premeditation may be established by any evidence from which the jury may infer that the killing was done "after the exercise of reflection and judgment." T.C.A. § 39-13-202(d); *see Pike*, 978 S.W.2d at 914-15; *Bland*, 958 S.W.2d at 660.

One learned treatise states that premeditation may be inferred from events that occur before and at the time of the killing:

Three categories of evidence are important for [the] purpose [of inferring premeditation]: (1) facts about how and what the defendant did prior to the actual killing which show he was engaged in activity directed toward the killing, that is, *planning activity*; (2) facts about the defendant's prior relationship and conduct with the victim from which *motive* may be inferred; and (3) facts about the *nature of the*

*killing* from which it may be inferred that the manner of killing was so particular and exacting that the defendant must have intentionally killed according to a preconceived design.

2 Wayne R. LaFave, *Substantive Criminal Law* § 14.7(a) (2d ed. 2003) (emphasis in original).

The evidence introduced at trial, in a light most favorable to the State, established that Ms. Wayne and Appellant had a relationship full of jealousy. Appellant had commented to Ms. Wayne's mother that he would "camp out on her doorstep" if Ms. Wayne got an apartment and told Ms. Wayne's father that no one else would get her. Appellant even tried to buy Ms. Wayne with a check. Appellant asked Ms. Wayne about her involvement with Mr. Benefield prior to the night of the incident.

According to the testimony, on the night of the incident, Appellant was not provoked by any of the visitors to Ms. Wayne's apartment. Instead, he dialed a number on his phone and stated the following into the phone, "Honey, it's Daddy . . . Meet me at the police station. I'm fixing to kill three people." Appellant then blocked Mr. Benefield from leaving the apartment, told him that he was going to die, and slashed his throat. Appellant then slashed the throat of Mr. Wells, who had been sleeping in the recliner. After doing so, Appellant asked Mr. Wells how it felt to die. Appellant did not render aid to the victims, who were both unarmed.

Ms. Wayne's father called on the phone. Appellant informed him that he had already "killed two" and was going to "kill some more." Appellant likewise informed law enforcement personnel of his intentions when they arrived on the scene.

Appellant initiated an unprovoked attack on two unarmed victims with a box cutter. Further, Appellant stated his intent to kill the victims prior to his horrifying behavior. Both victims suffered life threatening injuries as a result of Appellant's actions. Appellant remained calm after the event, informing the law enforcement personnel of what he had already done. The evidence is more than sufficient to show that Appellant committed attempted first degree murder. Appellant is not entitled to relief on this issue.

*Conclusion*

For the foregoing reasons, the judgments of the trial court are affirmed.

_____
JERRY L. SMITH, JUDGE